UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| JODI ROY, individually, and FIRST DAKOTA NATIONAL BANK, as special administrator of the estate of Christopher Bryon Mark John Alberty, deceased,<br><br>    Plaintiffs,<br><br>    vs.<br><br>LAKE COUNTY, SOUTH DAKOTA; ROGER HARTMAN, individually and in his capacity as the Lake County Sheriff; TIMOTHY WALBURG, individually and in his capacity as a Lake County employee; REBECCA FIEGEN, individually and in her capacity as a Lake County employee; CHARLES PULFORD, individually and in his capacity as a Lake County employee; and OTHER UNKNOWN PERSONS, individually and in their capacity as employees of Lake County, South Dakota,<br><br>    Defendants. | CIV. 12-4070-KES<br><br><br><br>ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT |

Plaintiffs, Jodi Roy and First Dakota National Bank, brought an action against defendants, Lake County, South Dakota, Lake County Sheriff Roger Hartman, Lake County Chief Deputy Sheriff Timothy Walburg, Correctional Officer Rebecca Fiegen, Correctional Officer Charles Pulford, and other unknown persons, alleging § 1983 claims for failure to provide medical care and for unlawful policy, custom, or habit, and state-law claims for wrongful death and a survival action based on defendants'

actions leading up to the death of Christopher Alberty. Defendants move for summary judgment on all of plaintiffs' claims. For the following reasons, defendants' motion is granted.

## BACKGROUND

The facts, viewed in the light most favorable to plaintiffs, the nonmoving parties, are as follows:

On October 3, 2009, Christopher Alberty was arrested for disorderly conduct by a highway patrol officer in Madison, South Dakota, and was booked into the Lake County Jail at 7:20 p.m. While being booked, Alberty reported to the booking officer that he was taking two medications. The corrections officers (CO) noted on an Arrest & Booking Medical Page that Alberty did not appear to be "despondent/depressed." Docket 35-1 at 2. At 8 p.m., CO Fiegen started her shift as the officer on duty at the jail. At 12:45 a.m. on October 4, CO Fiegen observed Alberty become agitated—he covered up the jail camera, spat, and acted unruly.[1] Docket 35-4 at 3. At 7:19 a.m., Alberty registered a 0.0000 on a preliminary breath test (PBT), and he was released shortly thereafter on a personal recognizance bond.

About two weeks later, on October 15, 2009, Alberty was again arrested, except this time for aggravated assault, and taken to the Lake County Jail. CO Fiegen was the officer on duty when Alberty was booked, and she was assisted by Chief Deputy

---

[1] CO Fiegen opined that this behavior stemmed from the fact that Alberty had been drinking and had been arrested. Docket 49-3 at 17.

Walburg. On the Arrest & Booking Medical Page, CO Fiegen noted that Alberty did not appear to be despondent or depressed and that Alberty was taking medications, "cleunipin for anxiety, conserta for ADHD."[2] Docket 35-3 at 2. CO Fiegen also asked Alberty several medical questions, including whether he had ever attempted suicide and whether he had any medical or mental health issues. Alberty responded "no" to both of these questions. *Id.*

After CO Fiegen and Chief Deputy Walburg learned Alberty did not have any of his medications, they inquired how to go about getting them. CO Fiegen stated, "You need your meds. There's no ifs, ands or buts. The meds have to get here. . . . My thing is the other week when you were here, you got extremely out of control because of the anxiety. It would be better to have at least, like, two pills." Docket 49-1 at 1-2. The officers attempted to get phone numbers from Alberty and his phone in order to call someone to retrieve the medications, but Alberty was unable to provide them with any. Alberty informed the officers that he could not get any from his doctor. *Id.* at 2. No further discussions took place regarding Alberty's medications at that time.[3]

During the October 15 booking process, CO Fiegen and Chief Deputy Walburg took pictures of Alberty due to the nature of the crime for which he was arrested,

---

[2] These two medications are actually spelled Klonopin and Concerta. Docket 48 at ¶ 16.

[3] Later, Chief Deputy Walburg asked other law enforcement officers to look for Alberty's medications in his apartment while they executed a search warrant. None were found.

3

aggravated assault. While taking photos, they noticed scars on his arm and asked him if they were from a suicide attempt. Alberty responded, "No. Not really. I wouldn't say suicide." Docket 49-1 at 1. Alberty was placed in his cell after the booking process was completed.

On October 16, 2009, Alberty's mother, Jodi Roy, spoke with Alberty on the telephone. Docket 49-3 at 33. Roy believes Alberty was depressed at the time they spoke; he told her that he thought he had disappointed her. Alberty asked Roy to come see him, and she told him that she would come on Wednesday, October 21. After the phone call, Roy told her family and people she worked with that Alberty was depressed, but she did not relay this information to anyone at the jail. *Id.* Roy, however, was not concerned Alberty was a suicide risk and "actually thought he was safe." *Id.*

Alberty spent most of his time at the jail sharing a cell with Charles Wallowing Bull, Jr. Wallowing Bull believed Alberty was depressed and observed that he was not eating and was sleeping the majority of the time. There is no indication that Wallowing Bull informed jail staff of these concerns. Alberty never told Wallowing Bull that he was planning to kill himself. Docket 36-2 at 6.

On October 18, 2009, at approximately 6:41 p.m., CO Pulford heard Wallowing Bull yelling from his cell. Docket 35-4 at 11. When CO Pulford reached the cell, he

saw Alberty hanging from a towel hook[4] and instructed Wallowing Bull to take him down. CO Pulford then ran back to the control room to radio for assistance.[5] Once assistance arrived—about seven minutes after CO Pulford was first alerted—the officers entered the cell and tried resuscitating Alberty.[6] The officers were unsuccessful; Alberty died by asphyxiation. Docket 36-2 at 3.

## LEGAL STANDARD

Summary judgment is appropriate if the movant "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party can meet this burden by presenting evidence that there is no dispute of material fact or that the nonmoving party has not presented evidence to support an element of her case on which she bears the ultimate burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). "The nonmoving party may not 'rest on mere allegations or denials, but must demonstrate on the record the existence of specific facts which create a genuine issue for trial.' " *Mosley v. City of Northwoods, Mo.*, 415 F.3d 908, 910 (8th Cir. 2005) (quoting *Krenik v. County of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995)).

---

[4] Alberty used a torn blanket to hang himself.

[5] Jail staff is taught not to open cell doors alone under any circumstances for safety precautions.

[6] Wallowing Bull had already taken Alberty down off the hook by the time the officers entered the cell. Docket 36-2 at 6.

Summary judgment is precluded if there is a dispute in facts that could affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). For purposes of a summary judgment motion, the court views the facts and the inferences drawn from such facts "in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986).

## DISCUSSION

Plaintiffs' amended complaint asserts four different claims: (1) a § 1983 claim for failure to provide medical care; (2) a § 1983 claim for unlawful policy, custom, or habit; (3) a state-law claim for wrongful death; and (4) a state-law survival action. Defendants move for summary judgment on all claims, providing specific defenses and arguments for each claim. In their brief in opposition to defendants' motion for summary judgment, plaintiffs only address defendants' arguments pertaining to the § 1983 claims, while ignoring defendants' arguments pertaining to the claim for wrongful death and the survival action. "[F]ailure to oppose a basis for summary judgment constitutes waiver of that argument." *Satcher v. Univ. of Arkansas at Pine Bluff Bd. of Trustees*, 558 F.3d 731, 735 (8th Cir. 2009). Plaintiffs have therefore waived their right to recover on their wrongful death claim and their survival action. The court now turns to plaintiffs' § 1983 claims.

## I. § 1983 Claim–Failure to Provide Medical Care

Plaintiffs claim defendants failed to provide adequate medical care and such failure caused Alberty's suicide. Because Alberty was a pretrial detainee, plaintiffs'

6

claim is analyzed under the Fourteenth Amendment, which provides pretrial detainees "at least as great protection as that afforded convicted prisoners under the Eighth Amendment." *Luckert v. Dodge Cnty.*, 684 F.3d 808, 817 (8th Cir. 2012). To succeed on a claim under the Fourteenth Amendment, a pretrial detainee must show the defendant officials were deliberately indifferent to his rights. *Walton v. Dawson*, ___ F.3d ___, No. 12-4000, 2014 WL 2053835, at *4 (8th Cir. May 20, 2014) (citing *Butler v. Fletcher*, 465 F.3d 340, 345 (8th Cir. 2006)). Here, the right that plaintiffs claim defendants were deliberately indifferent to was Alberty's "constitutional right to be protected from the known risks of suicide and to have his serious medical needs attended to." *Luckert*, 684 F.3d at 817 (citing *Yellow Horse v. Pennington Cnty.*, 225 F.3d 923, 927 (8th Cir. 2000)).

    The individual defendants have raised the defense of qualified immunity. "Qualified immunity shields government officials performing discretionary functions from civil liability unless their conduct violates clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.* at 817. "In the jail suicide context, qualified immunity is appropriate when a plaintiff has failed to show that his jailers have acted in deliberate indifference to the risk of his suicide." *Id.* To establish deliberate indifference, plaintiffs must demonstrate "the official actually knew of the risk and deliberately disregarded it." *Vaughn v. Greene Cnty., Ark.*, 438 F.3d 845, 850 (8th Cir. 2006). Specifically, plaintiffs must demonstrate that defendants failed to provide adequate medical treatment by showing (1) Alberty suffered from an

7

objectively serious medical need and (2) the individual defendant knew of the need and deliberately disregarded it. *Id.* at 850-51; *see also Hott v. Hennepin Cnty., Minn.*, 260 F.3d 901, 905 (8th Cir. 2001) ("We have generally treated allegations that officials failed to prevent jail suicides as claims for failure to provide adequate medical treatment."). "The inadequate medical care analysis focuses on the particular risk of suicide posed by the specific prisoner, rather than on the generalized threat of suicide among the population of prisoners as a whole." *Hott*, 260 F.3d at 905.

The court must satisfy itself that there is a genuine factual dispute as to whether Alberty suffered from an objectively serious medical need and whether defendants knew of such a need. *See Vaughn*, 438 F.3d at 850-51 ("Our initial inquiry is whether Blount suffered from an objectively serious medical need and whether [the defendant] knew of the need[.]"). "A serious medical need is one that is so obvious that even a layperson would easily recognize the necessity for a doctor's attention." *Id.* at 850. "The determination that prison officials had actual knowledge of a serious medical need may be inferred from circumstantial evidence or from the very fact that the risk was obvious." *Jones v. Minn. Dept. of Corr.*, 512 F.3d 478, 481-82 (8th Cir. 2008).

There is no question that being suicidal constitutes a serious medical need. *See Gregoire v. Class*, 236 F.3d 413, 417 (8th Cir. 2000) ("[A] risk of suicide by an inmate is a serious medical need."). The issue here, however, is whether any of the defendants had actual knowledge of Alberty's suicidal inclination.

Plaintiffs ultimately put forth three facts to establish that defendants knew of Alberty's risk of suicide and were deliberately indifferent in dealing with it.[7] First, plaintiffs note the fact that Alberty behaved bizarrely during his October 3, 2009, confinement. During Alberty's confinement, CO Fiegen observed Alberty become agitated. He covered up the jail camera with his shirt, spat, and acted "unruly." Docket 48 at ¶ 15. Plaintiffs do not explain how this behavior portrays suicidal tendencies. Contrarily, CO Fiegen believed the behavior stemmed from the fact that Alberty was drinking and had been arrested. Simply acting "unruly" is not enough to create suspicion that an inmate is suicidal such that an official is exposed to liability in the event that a suicide occurs. It would pose too large of a burden on jail officials if every time an inmate acted "unruly" the officials would be required to initiate suicide protocols. *Cf. Hott*, 260 F.3d at 906 ("[S]omething more than an inmate's gloomy affect is required to trigger a duty to inquire whether he is feeling suicidal.").

Second, plaintiffs rely heavily on the fact that Alberty told CO Fiegen and Chief Deputy Walburg during the booking process that occurred on October 15, 2009, that

---

[7] Plaintiffs also assert that Alberty had a long history of serious mental health issues. But plaintiffs fail to put forth any evidence that any of the defendants had knowledge of such history. To avoid qualified immunity, plaintiffs must show the individual defendants deliberately disregarded a "known" risk. Without putting forth evidence that the defendants had knowledge of Alberty's history of serious mental health issues, plaintiffs cannot rely on said history to create a factual dispute to avoid qualified immunity.

he was taking medications, namely Klonopin[8] and Concerta,[9] and that defendants failed to get him his medications. Plaintiffs emphasize that CO Fiegen stated, "You need your meds. There's no ifs, ands or buts. The meds have to get here." Docket 49-1 at 1. The record read in context reflects that CO Feigen was insistent on Alberty obtaining his medications because of the way Alberty acted during his jail stint on October 3 and not because she believed a failure to receive the medications would create a suicide risk. *See* Docket 49-1 at 2 ("My thing is the other week when you were here, you got extremely out of control because of the anxiety. It would be better to have at least, like, two pills."). Just as acting "unruly" is not enough to create suspicion that an inmate is suicidal, recognizing the benefit of receiving medication to prevent anxious behavior does not equate to recognizing a suicide risk. This is especially true when considering other circumstances that existed during the October 15, 2009, booking, which are discussed below.

Furthermore, plaintiffs have failed to identify how Alberty's statement that he was taking medications and did not have any at the time of booking instills in defendants knowledge that Alberty posed a suicide risk. If Alberty had said that without his medications he would become suicidal or very depressed, then plaintiffs' claim might pass muster. But nothing of that nature was said or suggested.

---

[8] Klonopin is an anti-anxiety drug. Docket 48 at ¶ 16.

[9] Concerta is a medication used to treat Attention Deficit Disorder. Docket 48 at ¶ 16.

Additionally, Alberty was unable to help the officers locate his medications when they tried to do so. The officers offered to make phone calls on his behalf to retrieve the medications, but Alberty could not provide them with phone numbers. The officers also attempted to find Alberty's medications in his residence, but none were located. And while it is somewhat unclear, it seems Alberty admitted that he was unable to get any medications from a doctor.[10] Docket 49-1 at 2. Plaintiffs fail to explain how this conduct constitutes deliberate indifference to a known suicide risk.

Third, plaintiffs point to the fact that defendants saw marks on Alberty's arm from when he had previously cut himself. Not only did the marks appear old, but Chief Deputy Walburg specifically asked Alberty if the marks were from a suicide attempt. Alberty responded, "No. Not really. I wouldn't say suicide." Docket 49-1 at 1. Thus, the marks on Alberty's arm did not make defendants knowledgeable of a possible suicide risk because Alberty himself said that the marks were not from a suicide attempt.

Not only do the facts that plaintiffs cite do little in terms of demonstrating defendants had actual knowledge of Alberty's suicide risk, but other undisputed facts and lack thereof highlight defendants' lack of knowledge. Alberty never stated to any individual defendant that he was suicidal or even depressed. In fact, Alberty was asked by CO Fiegen during his October 15, 2009, booking whether he had ever attempted

---

[10] Plaintiffs have failed to produce evidence that Alberty even had a valid prescription for the medications he claimed he was taking.

11

suicide and whether he had any medical or mental health issues. Docket 35-2 at 2. Alberty responded "no" to both questions. CO Fiegen also noted that Alberty did not appear to be "despondent/depressed."[11] *Id.* Furthermore, no other person indicated that Alberty was suicidal or depressed. Although one of the other inmates had concerns regarding Alberty's mood, that inmate never relayed those concerns to jail officers. Even if he had, "something more than an inmate's gloomy affect is required to trigger a duty to inquire whether he is feeling suicidal." *Hott*, 260 F.3d at 906. Likewise, Alberty's mother, Jodi Roy, spoke with Alberty on October 16, 2009, and while she believed he was depressed,[12] she did not think he was suicidal and, in fact, thought he was safe. Docket 49-3 at 33. No one, including Alberty himself, informed any of the defendants that Alberty was feeling suicidal or even depressed.

    In summary, plaintiffs cannot show that any individual defendant, or even the defendants as a whole, acted deliberately indifferent to a known suicide risk. There is no indication that any of the defendants had knowledge that Alberty was a suicide risk. And although Alberty stated that he was taking anti-anxiety and attention deficit disorder medications, defendants attempted to locate the medications but were unsuccessful in their attempts, in part, because Alberty could not provide them an avenue to do so. Plaintiffs failed to present evidence that any individual defendant

---

[11] The officer who booked Alberty on October 3 made the same observation.

[12] Roy did not tell anyone at the jail that she believed he was depressed. Docket 49-3 at 33.

knew of a suicide risk or that an individual defendant was deliberately indifferent to such a risk.[13] The individual defendants are therefore entitled to qualified immunity and summary judgment with respect to plaintiffs' § 1983 claim for failure to provide medical care.

## II.   § 1983 Claim–Unlawful Policy, Custom, or Habit

Plaintiffs also allege a § 1983 claim against Sheriff Hartman, Chief Deputy Walburg, and Lake County for failure to adopt adequate policies, procedures, and training. This claim necessarily fails because plaintiffs were unable to establish an underlying violation of Alberty's constitutional rights by a state actor, as discussed above. *Roe v. Humke*, 128 F.3d 1213, 1218 (8th Cir. 1997) (requiring an underlying violation of a plaintiff's constitutional rights in order to bring a claim for inadequate policies, customs, and training); *see also City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) ("If a person has suffered no constitutional injury at the hands of the individual police officer, the fact that the departmental regulations might have *authorized* the use of constitutionally excessive force is quite beside the point.").

---

[13] "In order to demonstrate that a defendant actually knew of, but deliberately disregarded, a serious medical need, the plaintiff must establish a mental state akin to criminal recklessness: disregarding a known risk to the inmate's health." *Thompson v. King*, 730 F.3d 742, 746-47 (8th Cir. 2013).

## CONCLUSION

Plaintiffs failed to bring forth evidence to create a disputed question of fact as to whether any defendant was deliberately indifferent to Alberty's constitutional right to be protected from the known risks of suicide. Based on the evidence that plaintiffs submitted, defendants simply had no knowledge of Alberty's risk of suicide, nor did any defendant act with deliberate indifference to any such risk. And because plaintiffs failed to establish an underlying violation of Alberty's constitutional rights, plaintiffs' claim for unlawful policy, custom, or habit must fail as well. Furthermore, plaintiffs waived their state-law claims by failing to respond to defendants' legal arguments asking for summary judgment on such claims. Accordingly, it is

ORDERED that defendants' motion for summary judgment (Docket 33) is granted.

Dated July 9, 2014.

BY THE COURT:

*/s/ Karen E. Schreier*
KAREN E. SCHREIER
UNITED STATES DISTRICT JUDGE